UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LARRY ANTILL**,                                     Case No. 1:12 CV 1405

                  Plaintiff,                          Judge Lesley Wells

         v.                                           REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL
SECURITY**,

                  Defendant.                          Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Larry Antill seeks judicial review of Defendant Commissioner of Social Security's decision to deny Supplemental Security Income (SSI). The district court has jurisdiction under 42 U.S.C. §§ 1383(c)(3). This case was referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2. (Non-document entry dated June 5, 2012). For the reasons given below, the undersigned recommends affirming the Commissioner's decision.

### BACKGROUND

Procedural History

On May 25, 2010, Plaintiff filed an application for SSI stating he was disabled due to high blood pressure, anxiety, poor vision, left hand injury, shingles, and rib pain. (Tr. 142, 161). He alleged a disability onset date of April 20, 2008, which he later amended to coincide with the date of his application. (Tr. 142, 155). His claim was denied initially (Tr. 95) and on reconsideration (Tr. 105). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 108). Born August 31, 1958, Plaintiff was 52 years old when the hearing was held on July 5, 2011. (Tr. 25, 31, 142). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after

which the ALJ found Plaintiff not disabled. (Tr. 21, 25).

Vocational History and Reports to the Agency

      Plaintiff completed high school in regular education classes. (Tr. 162, 249). His past work involved general labor jobs, cleaning, and operating rides at an amusement park. (Tr. 162). He explained he stopped working in July 2000 to care for his ill parents. (Tr. 161).

      Plaintiff reported he was homeless but sometimes stayed with friends to clean himself up and eat. (Tr. 179). His daily activities included reading newspapers, watching television, and doing household chores until he became tired. (Tr. 180). Plaintiff said he experienced pain in his left hand and rib cage and his nerves kept him awake at night. (Tr. 180). He also reported his left hand sometimes prevented him from getting dressed, but indicated he otherwise had no problems with personal care. (Tr. 181). Plaintiff stated he could prepare simple meals and tried to do so twice a day. (Tr. 181). He said he could clean, do laundry, and do some yard work, but tired quickly. (Tr. 182). Plaintiff also stated he shopped once every two weeks for about an hour and a half, and had no trouble managing his money. (Tr. 182–83).

      Plaintiff said he was no longer able to use his left hand much, due to an old injury. (Tr. 183). However, Plaintiff stated he could play board games, cards, and cornhole, attend cookouts with friends, go to the park for picnics, and try to help with cooking. (Tr. 183). He also stated he did not have problems getting along with family, friends, neighbors, or others. (Tr. 183). Plaintiff believed he could lift 25 or 30 pounds, walk half a mile before needing to rest, and sometimes pay attention for extended periods. (Tr. 184). He could follow written instructions, but sometimes had difficulty with spoken instructions. (Tr. 184). Additionally, Plaintiff said he got along very well with authority figures and handled change pretty well, but got nervous when he was stressed out. (Tr. 185).

2

Plaintiff said he did not drive much because he feared highway traffic. (Tr. 185).

Medical History

Plaintiff went to Northcoast Health Ministry on March 31, 2010 and was prescribed medications to control his high blood pressure. (Tr. 263–64). He reported drinking six to eight beers up to twice a week and was diagnosed with benign hypertension, chest pains not otherwise specified, and tobacco use disorder. (Tr. 263–64).

On April 24, 2010, Plaintiff went to the emergency room after falling in the kitchen and said he did not feel right, complaining of abdominal pain, nausea, and confusion. (Tr. 229–30, 233). He was in mild distress, had slurred speech, was a fall risk due to alcohol, and had recently used alcohol. (Tr. 229, 233).Plaintiff refused to provide a urine sample, stating he was unable to do so, but he smelled strongly of alcohol. (Tr. 230, 234, 237). He was diagnosed with alcohol intoxication, and discharged. (Tr. 230–31, 234). The instructions provided to Plaintiff at discharge stated using alcohol in such a way that he ended up in the hospital "strongly suggest[ed] that [he] may have a problem with alcohol abuse." (Tr. 235).

On June 16, 2010, Plaintiff followed up on his high blood pressure, noting he was trying to get it down as quickly as possible. (Tr. 260). Plaintiff reported he smoked and drank "a little". (Tr. 260). He saw a cardiologist on September 16, 2010 complaining of a history of chest pain and anxiety attacks. (Tr. 289). Plaintiff reported he could walk a mile or more without symptoms, but said he had panic attacks several times per week causing shortness of breath and feelings of impending death. (Tr. 289). Plaintiff said he smoked half a pack of cigarettes and drank five beers each day. (Tr. 290). His neurologic examination was normal, but his psychiatric examination was positive for anxiety, depression, and panic attacks. (Tr. 290). Plaintiff underwent a stress exercise

test, which was normal and showed no evidence of stress-induced ischemia. (Tr. 294). The cardiologist suspected Plaintiff had depression and panic disorder, noting his pain was "very atypical" for coronary artery disease. (Tr. 290).

Plaintiff saw Dr. Christopher Gillespie on September 24, 2010 complaining of left neck and shoulder pain, along with pain and stiffness in his left hand. (Tr. 287). Examination revealed hand pain, neck pain, and depression, but his neurological examination was negative. Plaintiff was in no distress, but had bony abnormalities on the palmar surface of his left hand and weakness in grip strength. (Tr. 287–88). On October 1, 2010, x-rays of Plaintiff's left hand showed a possible nondisplaced fracture of the middle phalanx of the fifth digit. (Tr. 296). Several days later, on October 4, 2010, Plaintiff followed up regarding his blood pressure and x-ray. (Tr. 258). His medications were adjusted and notes stated he had been advised to see a psychologist. (Tr. 258–59).

On October 11, 2010, Plaintiff saw an orthopaedist complaining of diffuse left hand pain and stiffness, decreased range of motion in his fingers, and hand discoloration when exposed to cold temperatures. (Tr. 285). The doctor noted color changes were typical of Raynaud syndrome. (Tr. 285). Plaintiff could make a fist, but his fingers would not reach down to his palm, and motion was limited in his fingers. (Tr. 285). Additionally, he had Dupuytren anomaly affecting his left ring finger, but no flexion contracture, no numbness or tingling, and no Tinel's or Phalen's sign. (Tr. 285). Notes stated he had bad clubbing in his fingertips and probably had vascular disease affecting his left upper extremity, but there were no good surgical options for him. (Tr. 285). X-rays revealed mild degenerative joint disease throughout the hand joints, and Plaintiff was diagnosed with diffuse osteoarthritis throughout his hand. (Tr. 285). However, the arthritis was mild and did not require any treatment, and the doctor told Plaintiff to treat Raynaud syndrome by avoiding aggravating activities

4

such as cold weather, and most importantly by quitting smoking. (Tr. 285).Plaintiff complained of

left hand pain to Dr. Gillespie on October 25, 2010. (Tr. 283). Notes indicated a history of arthritis

and stated Plaintiff's current medication regimen was well-tolerated. (Tr. 283). Plaintiff was alert,

cooperative, and in no distress. (Tr. 283). He was instructed to continue his current blood pressure

medication, quit smoking, and follow up. (Tr. 283).

On November 12, 2010, Plaintiff saw Psychiatric Clinical Nurse Specialist (PCNS) Margaret

J. Blasse for a mental health assessment. (Tr. 277). He reported sadness, difficulty sleeping,

hopelessness, worthlessness, occasional feelings of guilt, low energy, anxiety, restlessness,

concentration and memory problems, daily passive suicidal thoughts, muscle tension and panic

attacks, excessive spending on alcohol, and racing thoughts. (Tr. 277–88). Plaintiff said he was

divorced with three grown children, but had not had any contact with his children for eighteen

months and was hurt they would not come see him. (Tr. 277–78). Despite his April 2010 diagnosis

of alcohol intoxication and June 2010 statement to the cardiologist that he drank five beers per day,

Plaintiff told Ms. Blasse he had not consumed alcohol for ten months. (Tr. 278). Plaintiff also said

he was in severe pain and "might take aspirin" to treat it. (Tr. 279). He was adequately groomed,

cooperative, and oriented, with normal speech and logical, organized thought processes. (Tr. 280).

Ms. Blasse rated his judgment and insight as fair and poor, respectively, and his fund of knowledge

as "[o]kay". (Tr. 281). He also had a depressed, irritable, and anxious mood and affect. (Tr. 281).

Ms. Blasse diagnosed major depression and a history of alcohol and drug abuse, assigned a Global

Assessment of Functioning score (GAF)[1] between 41 and 50 and prescribed medications. (Tr. 281).

---

1. A GAF score of 41–50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., Text Rev. 2000) (*DSM-IV-TR*).

Plaintiff returned to Ms. Blasse on December 3, 2010 and reported little change, stating he had suicidal thoughts but no intent. (Tr. 274). Plaintiff said he got along with the friends he was living with but felt he was in their way. (Tr. 274). He reported using alcohol occasionally, said he was very depressed, and felt anxious. (Tr. 274). Plaintiff's affect was constricted but he was able to laugh, his judgment and insight were fair, his memory was within normal limits, his attention and concentration were sustained, he was cooperative, and his thought process was logical and organized. (Tr. 274–75). He reported severe hand pain, noting he tried to exercise it and keep it warm. (Tr. 275).

On December 16, 2010, Plaintiff told Ms. Blasse he continued to feel depressed but was sleeping a little better. (Tr. 271). He said he had passing suicidal thoughts but no intent. (Tr. 271). Plaintiff explained he was doing "okay" with his friends, could not use alcohol because he could not afford it, and no longer craved alcohol. (Tr. 271). He stated he was depressed during the holidays, but stayed at friends' houses to celebrate. (Tr. 271). Plaintiff said he helped his friends by cooking, doing laundry, and washing dishes. (Tr. 271). He had a constricted affect and depressed, anxious mood, but he was cooperative, his thought process was logical and organized, he had fair judgment and insight, his attention and concentration were sustained, and his memory was within normal limits. (Tr. 272). During the appointment, Plaintiff reported severe pain in his hand. (Tr. 272). His psychiatric medications were adjusted, and he was encouraged to do one productive activity each day. (Tr. 272).

Plaintiff saw Ms. Blasse on December 30, 2010 and reported he was busier, reading the newspaper, doing sit-ups and push-ups, lifting dumb bells, and taking walks. (Tr. 370). He stated he had a nice Christmas and enjoyed himself. (Tr. 370). He stayed with friends for the holidays and

made dinner for their family, and he also said he had been baking cakes and cookies. (Tr. 370). He continued to feel depressed, anxious, and lonely, and reported family conflicts. (Tr. 371). Plaintiff was adequately groomed, cooperative, and oriented, with normal speech and logical, organized thought processes. (Tr. 371). He had a depressed and anxious mood but smiled at times, had sustained attention and concentration, fair judgment and insight, and memory within normal limits. (Tr. 371). He continued to report severe hand pain, stating he treated it with aspirin and by keeping it warm. (Tr. 371). Ms. Blasse noted Plaintiff's GAF had improved, gave him information on AARP job assistance, and adjusted his medications. (Tr. 371).

On January 20, 2011, Plaintiff told Ms. Blasse he was angry with himself because he had wrecked his life by drinking and doing drugs. (Tr. 366). He stated he had been reading, looking for a cheap car, and seeking job assistance. (Tr. 366). His sleep varied and he reported occasional suicidal thoughts without intent, stating he distracted himself by doing chores. (Tr. 366). Plaintiff said he experienced panic attacks about finances, but wanted to start dating. (Tr. 367). He was adequately groomed, cooperative, and oriented, with normal speech, and logical, organized thought processes. (Tr. 367). He had a depressed and anxious mood but smiled frequently and appropriately, had sustained attention and concentration, fair judgment and insight, and memory within normal limits. (Tr. 367). Plaintiff continued to report hand pain, stating he treated the pain with aspirin and by keeping his hand warm. (Tr. 367). Ms. Blasse stated Plaintiff's GAF had improved and adjusted his medications. (Tr. 367).

On March 1, 2011, Plaintiff reported his mood was better and he was calmer, but he was angry with himself and thought he could have done better with his life. (Tr. 362). He reported he could no longer do physical work and was frustrated with his financial situation. (Tr. 362).

Additionally, Plaintiff stated he wanted to start driving again. (Tr. 362). He continued to report some trouble sleeping, but did not always take Trazadone. (Tr. 362–63). He also reported panic attacks and feelings of disappointment in himself, but said he liked to cook and bake and felt good doing those activities. (Tr. 363). He said he had not used alcohol for several months because he could not afford it. (Tr. 363). Plaintiff was adequately groomed, cooperative, and oriented, with normal speech, and logical, organized thought processes. (Tr. 363). He had a depressed and anxious mood but smiled frequently and appropriately, had sustained attention and concentration, fair judgment and insight, and memory within normal limits. (Tr. 363). Plaintiff continued to report hand pain, stating he treated the pain with aspirin and by keeping it warm. (Tr. 363). Ms. Blasse noted Plaintiff's GAF had improved, adjusted his medications, and encouraged him to set small goals to be productive and increase self esteem. (Tr. 363).

Plaintiff saw Dr. Gillespie on April 18, 2011 and said he was feeling well. (Tr. 350). He was in no distress and was cooperative, and his blood pressure medications were continued. (Tr. 350). Notes did not suggest he complained of hand pain at this appointment.

On May 3, 2011, Plaintiff was admitted to the hospital for an abscess on his right leg, and he later returned to the hospital complaining of increased pain and fever. (Tr. 304). He was initially prescribed antibiotics and Percocet to treat the abscess, but he did not fill the prescriptions because he decided to drink with a friend instead. (Tr. 304, 310–11). Plaintiff admitted drinking up to six beers per day and experiencing withdrawal symptoms. (Tr. 307). Physical examination revealed sensation grossly intact and normal range of motion in all extremities. (Tr. 312, 326, 340).

Opinion Evidence

*Physical Residual Functional Capacity (RFC) Assessments*

8

State agency physician Dr. Elizabeth Das noted Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; stand, walk, or sit for six hours in an eight-hour day; occasionally perform pushing and pulling with his left hand; frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; and frequently balance, kneel, stoop, crouch, and crawl. (Tr. 87). She stated Plaintiff was limited to frequent gross and fine manipulation on the left and should avoid concentrated exposure to vibration or hazards. (Tr. 87–88).

Plaintiff underwent a consultative examination and muscle testing with Dr. Kimberly Togliatti-Trickett in July 2011. (Tr.375 –78). Plaintiff had 4/5 strength in his shoulders, elbows, wrists, fingers, and lower extremities. (Tr. 375). He had abnormal grasp, manipulation, pinch, and fine coordination, but Dr. Togliatti-Trickett noted a question of effort on some of the testing. (Tr. 375). Plaintiff was unable to button and unbutton with his left hand and had range of motion problems with his left fingers, but no muscle atrophy. (Tr. 376–77). Dr. Togliatti-Trickett noted Plaintiff had a contracture of his left hand and could not use it. (Tr. 385). Plaintiff reported his pain was an eight out of ten, he could sit, stand, or walk for fifteen minutes, and he could lift twenty pounds. (Tr. 385). Contrary to other evidence, he said he did not consume alcohol and had no history of illicit drug use. (Tr. 386). Plaintiff presented with a slow, shuffling gait and was limited in squatting due to knee and ankle pain. (Tr. 386). He also had lumbar tenderness and an abnormal range of motion. (Tr. 386). Plaintiff's motor strength was 4/5 in all extremities, but he was limited due to pain and range of motion deficits. (Tr. 386). He had normal reflexes and sensation, but abnormal hand grasp, especially on the left. (Tr. 386).

Several of Dr. Togliatti-Trickett's findings appeared to be based on Plaintiff's subjective complaints about lifting, standing, and sitting. She found Plaintiff could frequently lift or carry up

to twenty pounds and continuously carry up to ten pounds. (Tr. 379). Dr. Togliatti-Trickett opined Plaintiff could sit, stand, or walk for only fifteen minutes at a time, explaining he could sit for a total of five hours and stand or walk for up to two hours total. (Tr. 380). She also limited Plaintiff to occasional reaching, handling, fingering, feeling, pushing, and pulling in his right hand, and said he could never do these activities with his left hand. (Tr. 381). Additionally, Dr. Togliatti-Trickett said Plaintiff could only occasionally operate foot controls with his right foot, and never with his left foot. (Tr. 381). She said Plaintiff could occasionally climb ramps and stairs and balance, but could never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (Tr. 382). Dr. Togliatti-Trickett opined Plaintiff could never tolerate unprotected heights and could only occasionally work around moving mechanical parts, operate a motor vehicle, tolerate humidity and wetness, or tolerate dust, odors, fumes, and pulmonary irritants. (Tr. 383).

*Psychological RFC Assessments*

On August 6, 2010, consulting psychologist Dr. Mitchell Wax examined and evaluated Plaintiff. (Tr. 249). During the evaluation, Plaintiff would not provide information about how he obtained money to live, suggesting family and friends gave him small amounts of money each month. (Tr. 249). He also stated he had been homeless for seven months and spent his nights going back and forth between friends' houses. (Tr. 249). Prior to being homeless, he had lived in a trailer he inherited from his parents, but he was evicted when he failed to pay the lot fee. (Tr. 249). Plaintiff told Dr. Wax he had arthritis in his left hand and pain in his left side, which prevented him from working. (Tr. 250). Regarding the April 2010 hospital visit, Plaintiff said he had passed out but did not provide information about why this had happened. (Tr. 250). Dr. Wax noted Plaintiff had no prior psychiatric care or hospitalizations. (Tr. 250). Plaintiff told him he had been arrested ten times,

10

four or five times for cocaine possession and twice for disorderly conduct, but he would not provide further information about his arrest record. (Tr. 250). He reported a significant history of cocaine use and said he had last used cocaine a year earlier. (Tr. 250). Additionally, Plaintiff reported drinking seven beers the night before his evaluation. (Tr. 250). He said he had been drinking most of his life and had been treated for it twice, and Dr. Wax suspected alcohol abuse. (Tr. 250).

Plaintiff could not remember his last employer and could not remember why he quit, but he stated he had no difficulty with coworkers or supervisors. (Tr. 250). Plaintiff often did not answer questions directly, and Dr. Wax thought his inability to focus was the result of his heavy drinking the previous night. (Tr. 251). Plaintiff would not provide clear information about how he obtained money for cocaine or alcohol, and Dr. Wax suspected malingering. (Tr. 251). Plaintiff told Dr. Wax he could take care of himself, liked places clean, and vacuumed twice a day if he was able to stay in one place, causing Dr. Wax to suspect obsessive compulsive disorder. (Tr. 251).

Plaintiff's coherence was marginal, he needed questions simplified, and he often responded in one or two word sentences. (Tr. 251). His affect was blunted and he reported difficulty sleeping, occasional feelings of hopelessness, and low energy. (Tr. 251). He also reported fidgeting, though Dr. Wax did not observe any trembling, fidgeting, or pacing. (Tr. 251). Plaintiff said he had problems with excess sweating, but Dr. Wax did not observe autonomic signs of anxiety. (Tr. 251). Plaintiff did not appear anxious or fretful, but said he had panic attacks daily and found it difficult to be around people. (Tr. 251–52). Plaintiff's mind digressed and he misinterpreted Dr. Wax at times. (Tr. 252). Dr. Wax also noted some somatization and grandiosity, with Plaintiff "appearing very full of himself", leading Dr. Wax to suspect personality disorder. (Tr. 252).

Plaintiff's consciousness was clouded and his ability to concentrate was intermittent, but he

11

had a good memory for past, recent, and current events and Dr. Wax concluded he was of average intelligence. (Tr. 252). Though Dr. Wax noted intermittent memory problems, he believed this could be the result of Plaintiff's drinking. (Tr. 252). Dr. Wax believed that due to Plaintiff's suspected polysubstance dependence, he could not manage his own funds. (Tr. 253). Plaintiff reported he bathed several times a week and helped his friends by doing the dishes, laundry, and vacuuming when he stayed with them. (Tr. 253). He was vague about how he spent a typical day. (Tr. 253). He stated on some days he visited with friends or cut people's grass to earn extra money and further reported he could do yard work with breaks. (Tr. 253).

Dr. Wax concluded Plaintiff had a personality disorder and did not currently have sufficient judgment to live independently, due to polysubstance dependance. (Tr. 254). He opined Plaintiff's ability to relate to others was markedly impaired due to the personality disorder, noting he would have difficulty working with most people. (Tr. 254). Additionally, Dr. Wax noted Plaintiff's ability to understand, remember, and follow instructions was mildly impaired; he was mentally able to understand, remember, and follow simple instructions to work at a job. (Tr. 254). He found Plaintiff's ability to maintain attention, concentration, and persistence moderately impaired, and his ability to withstand the stress and pressure of daily work activity markedly impaired. (Tr. 254). Dr. Wax believed Plaintiff's drug and alcohol use rendered him unable to stay focused at work, but noted he was able to perform simple, repetitive tasks. (Tr. 254). Still, Dr. Wax believed Plaintiff would have trouble maintaining a job due to his depression, personality disorder, and inability to remain focused. (Tr. 255). He assigned Plaintiff a GAF of 51, noting Plaintiff had few friends and could not keep a job. (Tr. 256).

On September 21, 2010, state agency psychologist Dr. Irma Johnston noted Plaintiff's

medically determinable mental impairments included polysubstance dependence and personality disorder. (Tr. 75). She noted Dr. Wax's restriction assessments, along with his belief that many of Plaintiff's limitations resulted from his past and current alcoholism. (Tr. 76). On January 18, 2011, consulting psychologist Dr. Vicki Warren noted Plaintiff had moderate restriction in activities of daily living, mild difficulties maintaining social functioning, and mild difficulties maintaining concentration, persistence, or pace. (Tr. 85). Dr. Warren noted Plaintiff was limited to work that did not involve constant social interactions because he was moderately limited in his ability to get along with coworkers or peers, further stating he should be limited to low-stress work with infrequent changes due to a moderate limitation responding appropriately to changes in the work setting. (Tr. 89). She further noted Plaintiff's statements regarding substance abuse were not credible. (Tr. 89).

ALJ Hearing

Plaintiff testified about his anxiety attacks and difficulty using his left hand, reporting he could not use his hand for anything. (Tr. 32–33). He inconsistently reported his substance use, first stating he had a beer "maybe every once in a great while", then stating he had not consumed substances for ten years, then stating it had probably been a year since he had a drink. (Tr. 36). Corroborating his previous reports to doctors, Plaintiff said he sometimes mowed lawns to earn extra money. (Tr. 38–39). He stated he saw a counselor and had trouble concentrating. (Tr. 40–41). Despite complaining that he used his right hand for everything due to pain in his left hand, he stated doctors had not prescribed anything for his arthritis. (Tr. 43). First, Plaintiff said he could not walk longer than five minutes (Tr. 45), but he later testified he walked to the store or around the block once a day (Tr. 49, 51). Plaintiff denied being intoxicated in April 2010 when he fell in his kitchen, stating he did not understand why the hospital would have diagnosed him with alcohol intoxication.

13

(Tr. 52). Finally, Plaintiff testified he previously worked in a paint room dipping laundry tub legs – which weighed less than a pound – in paint and hanging them to dry. (Tr. 59).

The VE testified Plaintiff's past work sounded as though it were light, unskilled work, and the closest *Dictionary of Occupational Titles (DOT)* classification for it was hand painting. (Tr. 61). The ALJ asked the VE to consider a person of Plaintiff's age, educational, and vocational background with the following limitations: He could lift twenty pounds occasionally and ten pounds frequently; stand, walk, or sit for six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to unprotected heights and vibration; could not operate dangerous machinery; must be limited to tasks that did not require constant social interactions but could have frequent interaction with others; was limited to routine tasks with no high production quotas; was right-hand dominant with no manipulative limitations on the right; and was limited to frequent fine and gross manipulation on the left. (Tr. 62). The VE testified such a person could perform Plaintiff's past work as a hand painter. (Tr. 62–63). If the person were limited to occasional fine and gross manipulation on the left, the person would not be able to perform Plaintiff's past work and would not be able to perform most light or sedentary jobs, as those require more than occasional bilateral use of hands and arms. (Tr. 63).

ALJ Decision

The ALJ found Plaintiff had not engaged in substantial gainful activity since May 25, 2010, the application date and his amended alleged onset date. (Tr. 15). He found Plaintiff suffered the severe impairments of diffuse osteoarthritis of the left hand, hypertension, shingles, personality disorder, depression, anxiety, and polysubstance abuse, but found these impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 15). With

14

regard to Plaintiff's mental impairments, the ALJ found he had mild restrictions in activities of daily living, moderate difficulties with social functioning, marked difficulties with concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 16–17). Specifically, he noted Plaintiff could cook, grocery shop, complete chores, and attend to personal hygiene; visited with friends when they were home but only rarely saw his children; and demonstrated focus and concentration problems during the evaluation with Dr. Wax. (Tr. 16).

After considering the record, the ALJ found Plaintiff retained the RFC to perform light work, with the following limitations:

> [He] can lift, carry, push, and pull 20 pounds occasionally and ten pounds frequently. He can stand or walk six hours out of an eight-hour workday with normal breaks. He cannot climb ladders, ropes, or scaffolds. [He] must avoid concentrated exposure to unprotected heights and vibrations, and he may not operate dangerous machinery. He is limited to . . . tasks that do not require constant social interaction, but he may have frequent contact with others. He is limited to performing routine tasks with no high production quotas. Finally, [Plaintiff] is limited to performing frequent fine and gross manipulation with his left hand, has no manipulation limitation of his right hand, and is right hand dominant.

(Tr. 17–18). The ALJ found Plaintiff not credible regarding the severity of his symptoms, noting his extensive alleged limitations were "discredited by the absence of supportive objective medical findings, [his] relatively conservative treatment despite reporting severe pain, and [his] numerous inconsistent statements throughout the record." (Tr. 18). He went on to summarize Plaintiff's medical record and testimony, particularly focusing on Plaintiff's numerous inconsistent statements. (Tr. 18–20). The ALJ gave less weight to Dr. Togliatti-Trickett's consultative examination because he found objective medical findings failed to support extensive functional limitations. (Tr. 20). He also gave little weight to Dr. Wax's conclusions because they were based largely on Plaintiff's subjective limitations, which even Dr. Wax found inconsistent and lacking in candor. (Tr. 20).

15

Based on the length of time Plaintiff performed the job, the extent of wages earned, and VE testimony, the ALJ determined Plaintiff could perform his past relevant work as a hand painter. (Tr. 21). He therefore found Plaintiff not disabled. (Tr. 21). The Appeals Council denied review (Tr. 1), making the ALJ's decision the final decision of the Commissioner.

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20

16

C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

> 1. Was the claimant engaged in a substantial gainful activity?
>
> 2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
>
> 3. Does the severe impairment meet one of the listed impairments?
>
> 4. What is claimant's residual functional capacity and can he perform past relevant work?
>
> 5. Can the claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff's two arguments are interconnected and therefore addressed together. First, he argues the ALJ's RFC determination was not supported by substantial evidence and his decisions to give less weight to Dr. Wax's and Dr. Togliatti-Trickett's consultative opinions were unwarranted. (Doc. 16, at 5–7). Specifically, Plaintiff contends the ALJ should not have concluded

he could perform frequent fine and gross manipulation with his left hand, and should have assessed greater mental limitations. (Doc. 16, at 6–7). Plaintiff also argues the VE's testimony that Plaintiff could perform his past work was based on a hypothetical that did not accurately portray Plaintiff's limitations – the same hypothetical that later became the RFC. (Doc. 16, at 9–11).

Plaintiff alleges the RFC and hypothetical were flawed because the ALJ did not properly assess consulting physician opinions, and he contends the evidence corroborates the extreme limitations imposed by Dr. Wax and Dr. Togliatti-Trickett. Generally, more weight is given to a source that has examined a plaintiff than to a source who has not examined him, and Dr. Wax and Dr. Togliatti-Trickett both examined Plaintiff. 20 C.F.R. § 404.1527(c)(1). In determining how much weight to afford a particular opinion, an ALJ must consider the following additional factors: treatment relationship –  length, frequency, nature and extent; supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; consistency of the opinion with the record as a whole; and specialization. 20 C.F.R. § 404.1527(c)(2)–(5).

With respect to Dr. Wax's opinion, Plaintiff focuses on his findings that Plaintiff was markedly impaired in his abilities to relate to others and withstand the stress and pressures of work activity. (Doc. 16, at 5). However, Plaintiff ignores that Dr. Wax's opinion heavily emphasized alcohol abuse as a reason for Plaintiff's functional limitations. Limitations that would not exist but for alcohol addiction may not serve as the basis for disability benefits. *See* 20 C.F.R. § 416.935 ("If we find . . . medical evidence of your drug addiction or alcoholism, we must determine whether your . . . addiction is a contributing factor material to the determination of disability".). The "key factor" in whether drug addiction or alcoholism is a contributing factor is whether the person would still be disabled if he stopped using drugs or alcohol. 20 C.F.R. § 416.935(b)(2). If his remaining limitations

18

would not be disabling absent drug or alcohol use, the person's drug addiction or alcoholism is a contributing factor material to disability and cannot be used as the basis for benefits. 20 C.F.R. § 416.935(b)(2)(I).

Dr. Wax's evaluation found marked impairments, but he explicitly noted alcohol abuse caused a significant number of Plaintiff's problems. Plaintiff was vague or evasive with Dr. Wax, refusing to explain how he obtained money for drugs and alcohol, but told Dr. Wax he drank seven beers the night before the evaluation. (Tr. 249–50). Dr. Wax suspected alcohol abuse even with Plaintiff omitting the reason for his April 2010 hospital stay, when he was diagnosed with alcohol intoxication after falling or passing out in his kitchen. (Tr. 230, 250–51). Additionally, Dr. Wax suspected malingering and noted somatization. (Tr. 251). Despite Plaintiff's symptom descriptions, Dr. Wax did not observe Plaintiff trembling, fidgeting, or pacing; he did not exhibit autonomic signs of anxiety; he did not appear anxious or fretful; and he reported spending time with and helping friends. (Tr. 251–52). Although Dr. Wax thought Plaintiff had some memory problems, he thought this could have been the result of Plaintiff's drinking. (Tr. 252). Similarly, Dr. Wax thought Plaintiff's polysubstance dependence prevented him from managing his own funds, living independently, and staying focused at work. (Tr. 253–54). Because Dr. Wax's opinion regarding Plaintiff's marked limitations was so largely based on alcohol abuse, the ALJ did not err by assigning it little weight.

Further, Ms. Blasse's records of Plaintiff's psychiatric treatment were inconsistent with the limitations Dr. Wax imposed, and Plaintiff's dishonesty with Ms. Blasse regarding his alcohol use renders conclusions based on his subjective complaints less convincing. In November 2010, Plaintiff told Ms. Blasse he had not consumed alcohol for ten months. (Tr. 278). However, he was diagnosed

19

with alcohol intoxication in April 2010, told a cardiologist he drank five beers per day in June 2010, and told Dr. Wax he drank seven beers the night before his evaluation in August 2010. (Tr. 230, 250, 290). Ms. Blasse's objective observations showed Plaintiff was almost always adequately groomed, cooperative, and oriented, with normal speech and logical, organized thoughts. (Tr. 272, 274–75, 280, 363, 367, 371). She also consistently noted he had sustained attention and concentration, fair insight and judgment, and memory within normal limits. (Tr. 272, 274–75, 363, 367, 371).

Moreover, treatment notes showed Plaintiff generally improved. (Tr. 281). He reported getting along with friends, helping them around the house, and cooking for them during Christmas. (Tr. 271, 274, 370). Plaintiff was able to laugh and smile appropriately during sessions. (Tr. 274–75, 367). He eventually reported he was busier, calmer, and had a better mood. (Tr. 362, 370). He was angry with himself for spending his life drinking and doing drugs, but reported positive activities such as reading the newspaper, doing sit-ups and push-ups, lifting dumb bells, taking walks, baking cakes and cookies, and looking for an inexpensive car to purchase. (Tr. 362–63, 366–67, 370). Plaintiff even wanted to start dating, and was seeking assistance finding a job. (Tr. 366–67).

The evidence showed Plaintiff got along with friends, started engaging in a variety of activities, wanted to look for work and start driving again, and did not display objective signs of attention or memory problems. In his function report, Plaintiff even admitted he had no problem getting along with other people, including authority figures, could sometimes pay attention for extended periods, followed written instructions well, only "sometimes" had problems with spoken instructions, and handled change pretty well. (Tr. 183–85). Therefore, the other records did not corroborate Dr. Wax's opinion and in fact provided substantial evidence supporting the ALJ's conclusion that Plaintiff was not as limited as he alleged.

20

Plaintiff also argues the ALJ erred in rejecting Dr. Togliatti-Trickett's opinion, which imposed significant physical limitations on Plaintiff. However, though Dr. Togliatti-Trickett's testing did reveal some abnormal grasp, manipulation, pinch, fine coordination, and range of motion issues in Plaintiff's left upper extremity (Tr. 375–77, 385), overall there was very little objective evidence documenting Plaintiff's left hand limitations. Further, he pursued only conservative treatment for his alleged hand pain, and his serious credibility problems undermined subjective complaints that he could not do anything with that hand.

Plaintiff had 4/5 muscle strength in his upper extremities, including both fingers; he had no signs of muscle atrophy; and Dr. Togliatti-Trickett noted questionable effort on some testing. (Tr. 375–77, 385). X-rays revealed only mild degenerative joint disease, which did not require any treatment. (Tr. 285). Despite bony abnormalities and clubbing on his left hand, Plaintiff could make a fist and had no flexion contracture, numbness, or tingling in his left hand. (Tr. 285, 287–88). Plaintiff was never prescribed pain medication for his allegedly disabling hand pain, and though he frequently complained of the pain to Ms. Blasse during psychiatric treatment, he rarely sought medical treatment for his hand. In fact, Plaintiff's doctor appointments rarely focused on his hand pain, he said he was feeling well the last time he saw Dr. Gillespie, and he consistently told Ms. Blasse he just used aspirin to treat his pain. (Tr. 279, 350, 363, 367, 371).

Throughout the ALJ hearing and the entire record, Plaintiff made numerous inconsistent statements that rendered his complaints about disabling symptoms not credible. He was never consistent discussing his alcohol consumption and refused to acknowledge he had been intoxicated at the April 2010 emergency room visit, despite the diagnosis. He claimed he was in significant pain, but did not seek anything stronger than aspirin to treat that pain. He claimed he could not do

anything with his left hand, including his past work – which involved lifting one-pound laundry tub legs, dipping them in paint, and hanging them to dry – yet he reported activities far more robust than that, almost all of which necessarily require fairly extensive use of his left hand. (Tr. 32–33, 38–39, 59, 180, 1820083, 253, 271, 274, 362–63, 366–67, 370). For example, Plaintiff reported playing games, baking cakes and cookies, cooking dinner for his friends' families, doing push-ups, lifting dumb bells, taking walks, reading the newspaper, doing laundry and dishes, and mowing lawns. (Tr. 49, 51, 180, 182–83, 253, 271, 362–63, 366–67, 370).

Given Plaintiff's serious credibility issues, his conservative treatment approach, and vast inconsistencies between Dr. Togliatti-Trickett's assessed limitations and other evidence as to Plaintiff's functionality, the ALJ did not err in giving her opinion little weight, or in finding Plaintiff can frequently use his left hand for gross and fine manipulation. Substantial evidence supports the ALJ's RFC determination, and because the hypothetical accurately represented Plaintiff's limitations, there was no error at step five.

### CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and applicable law, the Court should find substantial evidence supports the Commissioner's decision denying SSI. The undersigned therefore recommends affirming the Commissioner's decision.

s/James R. Knepp, II
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).